UNITED STATES of America; the State of New York, and UDC–Love Canal, Inc., Plaintiffs,

v.

HOOKER CHEMICALS & PLASTICS CORPORATION; Hooker Chemicals Corporation; Occidental Petroleum Investment Company; the City of Niagara Falls, New York; Niagara County Health Department; and the Board of Education of the City of Niagara Falls, Defendants.

No. CIV–79–990C.
(Love Canal Landfill).

United States District Court,
W.D. New York.

Supplemental Order No. 6 Sept. 11, 1986.

U.S. Dept. of Justice, Environmental Enforcement Section, Land and Natural Resources Div. (Albert M. Cohen, of counsel), Washington, D.C., Robert Abrams, Atty. Gen., State of N.Y. (Edith Holleman, Asst. N.Y. State Atty. Gen., of counsel), New York City, for plaintiffs.

Wald, Harkrader & Ross (Thomas H. Truitt, of counsel), Washington, D.C., Phillips, Lytle, Blaine, Hitchcock & Huber (David K. Floyd, and Robert E. Glanville, of counsel), Buffalo, N.Y., for defendant Occidental.

Gellman, Brydges, Schroff & Schweitzer (Earl W. Brydges, of counsel), Niagara Falls, N.Y., for defendant City of Niagara Falls.

## SUPPLEMENTAL ORDER NO. 6

CURTIN, Chief Judge.

Occidental Chemical Corporation [OCC] now brings a motion to compel the State of New York [the State] to produce all health data relating to Love Canal residents and others sought by OCC's document requests and interrogatories to the State. The State opposes this motion and relies primarily upon section 206(1)(j) of the New York Public Health Law, as well as the Public Health Law generally, as support.[1]

The relevant facts of this case are as follows. From about 1942 until 1953, Hooker Chemicals & Plastics Corporation dumped over 40 million pounds of chemical wastes into a ditch, known as the Love Canal, in Niagara Falls, New York.[2] In 1953, the property containing the landfill was conveyed to the Niagara Falls School District. Subsequent transactions conveyed portions of the property to the City of Niagara Falls and to several individuals. Although no homes were constructed on the property, many residences were built on the land adjacent to the former landfill.

In 1978, the New York State Department of Health [DOH] began its investigation of the health complaints of the Love Canal residents. See Item 186, Affidavit of David Axelrod [Axelrod Affidavit]. In the process, it conducted more than 11,100 field interviews in the Niagara County area, primarily involving Love Canal area residents, their physicians, and control populations.[3] See Item 189, Exh. J, Love Canal: A Special Report to the Governor & Legislature, April 1981 at page 21 [Special Report]. One of seven medical questionnaires was administered to various persons for the purpose of evaluating residents' health complaints and to "determine the nature, degree and source of excessive health risks, if any, faced by persons who present-

---

**1.** Section 206(1)(j) states that the Commissioner of the Department of Health shall

cause to be made such scientific studies and research which have for their purpose the reduction of morbidity and mortality and the improvement of the quality of medical care through the conduction of medical audits within the state. In conducting such studies and research, the commissioner is authorized to receive reports on forms prepared by him and the furnishing of such information to the commissioner, or his authorized representatives, shall not subject any person, hospital, sanitarium, rest home, nursing home, or other person or agency furnishing such information to any action for damages or other relief. Such information when received by the commissioner, or his authorized representatives, shall be kept confidential and shall be used solely for the purposes of medical or scientific research or the improvement of the quality of medical care through the conduction of medical audits. Such information shall not be

admissible as evidence in any action of any kind in any court or before any other tribunal, board, agency, or person.

**2.** For an interesting discussion on the history of the Love Canal, see A. Gordon Levine, Love Canal: Science, Politics, and People (1982).

**3.** In 1978, the New York State Legislature adopted Title XII of Article XIII of the Public Health Law (L. 1978, ch. 487) and, because of potential hazard at the Love Canal landfill site (Public Health Law, § 1385), directed the Commissioner of Health to "conduct a study of . . . [t]he effects of health hazards associated with exposure to toxic substances emanating from certain landfills" (Public Health Law, § 1386). The Legislature also authorized the commissioner to declare the existence of an emergency if he found "great and imminent peril to the health of the general public" (Public Health Law, § 1388) and directed him to report on the matter by September 15, 1978 (Public Health, § 1389).

ly or ever lived near the landfill." [4] *Id.* To verify and supplement the responses to these questionnaires, DOH obtained residents' physician and hospital records, usually through written releases from the patients. Haughie Affidavit at ¶¶ 6–8. Other records and complete medical histories of residents with specific medical problems were obtained and reviewed by the DOH. The DOH also compiled and studied birth and fetal death certificates and, in August of 1978, sponsored voluntary blood testing for all Love Canal area residents. *Id.* at ¶¶ 9–11.[5]

Among the information collected through the above means is highly personal and sensitive material relating, *inter alia*, to incidence of venereal disease, psychiatric histories, out-of-wedlock pregnancies, and contraceptive use. Item 186, Affidavit of Philip J. Harper [Harper Affidavit], ¶ 6. According to the DOH, all of this information was gathered in an effort "to determine whether an increased incidence of certain health conditions existed among the

4. The questionnaire sought certain specific demographic information, as well as information regarding 148 specific medical conditions, information concerning present complaints or symptoms, therapeutic history, residential history, occupational history, chemical exposure, social history, family history, and patterns of hereditary illness. *See* Item 41, Affidavit of Glenn E. Haughie [Haughie Affidavit].

5. Under its auspices, the DOH obtained 4,386 blood samples from 3,919 individual residents, totaling some 114,036 separate blood tests. *See* Special Report at page 21.

6. OCC states that, in addition to health questionnaires, medical records, birth certificates, fetal death certificates, and blood test results, the State also has in its possession the following health-related materials:
1. Health data relating to persons who worked at the 99th Street School;
2. Health data relating to persons who were involved in the remedial work at the Love Canal site;
3. Consents to limited disclosure of health data and records executed by Love Canal residents;
4. Documents relating to the "Blue Ribbon Panel" established by the State to study Love Canal health data;
5. Billing and other financial records for health testing;
6. Autopsy data for Love Canal residents;

Love Canal residents." Haughie Affidavit at ¶ 12.[6]

At the time the residents completed the above questionnaires, they consented to their use for research purposes, provided that their identities were not revealed. Verbal assurances of confidentiality were also given by the DOH during the course of the investigation. Later, some of the residents authorized the release of the accumulated medical information concerning them to certain federal and State agencies "for litigation purposes," provided that their names and addresses be deleted. Access to the use of this latter material was made subject to the issuance of a protective order by this court.[7]

In August of 1978, the Commissioner of Health declared a health emergency in the Love Canal area. Many of the residents were eventually relocated and had their homes purchased by a State agency. A program was also commenced by the State to contain the spread of toxic wastes from the landfill.

7. Miscarriage data for Love Canal residents;
8. Birth defect and child malformation data for Love Canal residents;
9. Cancer risk calculations;
10. Relocation-related documents; and
11. Miscellaneous documents identifying Love Canal residents and their medical conditions and health problems.
*See* Item 180, Affidavit of Steven K. Yablonski [Yablonski Affidavit] ¶ 9.

7. At a hearing held on June 25, 1980, this court ruled from the bench that release of the requested data would be limited initially to data pertaining to those residents who signed a consent form agreed to by the parties. This court made clear and asked that the affected residents be advised that if voluntary consent did not succeed in production of the requested data, it would consider compelling production of the remaining data to the government, and possibly to OCC, without their consent, pursuant to a protective order (*see* Item 180, Exh. E).

Consent forms were mailed to the Love Canal residents on September 10, 1980 (Item 180, Exh. F), but less than one-fifth of them have been executed and returned. Yablonski Affidavit, ¶ 18. Even as to the health data of those residents who have signed consents, no data has been produced because the consents were contingent upon entry of a protective order which has not been requested by the government. *Id.*

At issue in the present motion is whether defendant OCC can compel the State to produce certain health data pursuant to the company's discovery requests under Rule 37(a) of the Federal Rules of Civil Procedure.[8] The State opposes this motion.

OCC sets out essentially three grounds in support of its present motion. First, OCC argues that the production of the Love Canal health data is proper because it is relevant to the subject matter of this litigation and necessary to OCC's defense. Second, the company contends that neither section 206(1)(j) of the State's Public Health Law, the Public Health Law generally, nor any state court decision based thereon operates to protect the health data from discovery in this action. Third, OCC states that any privacy interest of Love Canal residents or any governmental interest of the State would be adequately protected by its proposed protective order. All of these arguments—and the State's responses to them—will be set out more fully below.

*Relevance and Necessity*

First, OCC claims that the health data it seeks meets the standard of relevancy set forth in Rule 26(b)(1) of the Federal Rules of Civil Procedure because it relates directly to the alleged threat to public health posed by conditions at Love Canal as set forth in the State and federal complaints. The company states, further, that it must obtain full responses to these discovery requests so that it can prepare its defense, which, in part, will consist of an attempt to refute plaintiffs' claim that there was a serious and immediate health threat to persons living at Love Canal by showing an absence of actual harm. *See* Yablonski Affidavit, ¶¶ 19–20.

Moreover, OCC alleges that the health data relates directly to the State's effort to recoup various remedial and relocation expenditures because former DOH Commissioner Whalen's August 1978 Emergency Order was based, in part, on the health data now asserted to be privileged. *See* Axelrod Affidavit, ¶ 10; Yablonski Affidavit, ¶ 21.

Further, the company asserts that no meaningful alternative source exists for obtaining this data because of the great expense in time and money involved, as well as the difficulty of obtaining consent from the Love Canal residents themselves. Additionally, OCC contends that the Love Canal residents simply do not have a majority of the information requested. Finally, the company notes that the health data records are the only accurate records—unaffected by the problems of memory—reflecting the health conditions closely contemporaneous with residence at Love Canal. Yablonski Affidavit, ¶¶ 22–24.

The State claims that OCC's above arguments are without merit. It argues that OCC's liability under CERCLA, section 107(a), 42 U.S.C. § 9607(a), and the common law does not depend upon an offer of proof of the information contained in the health data which is the subject of the present motion. More specifically, the State says that it need only show a *threat to public health—rather than evidence of actual individual health effects*—in order to show a public nuisance. *City of Rochester v. Gutberlett*, 211 N.Y. 309, 105 N.E. 548 (1914).

Further, the State claims that, even if evidence of Love Canal residents' health information were found to be somehow relevant to this lawsuit, it is insufficient to justify the defeat of section 206(1)(j) policies of confidentiality.

In addition, the State says that because the Love Canal residents' health information will not be used against OCC, the company need not be given an opportunity to dispute its validity. The State also argues that OCC may gather its own evidence if it believes that it would have probative value in this case. Finally, the State argues that this court should defer decid-

**8.** The Yablonski Affidavit indicates that the company now seeks to compel discovery of all documents requested under Rule 34 in addition to answers to its interrogatories under Rule 35 "to the extent documents and information relating to the health of Love Canal residents and others were withheld by the State in response to OCC's discovery requests." *Id.,* pp. 5–8.

ing this motion pending resolution of plaintiff's upcoming motions for summary judgment.

*New York State Public Health Law, Section 206(1)(j)*

OCC's second argument is that the New York State Public Health Law does not bar discovery of the health data in this case. *Cf., In re Love Canal Actions,* 112 Misc.2d 861, 449 N.Y.S.2d 134 (Sup.Ct.1982), *aff'd,* 92 A.D.2d 416, 460 N.Y.S.2d 850 (4th Dept. 1983).

More specifically, OCC claims that section 206(1)(j) and the Fourth Department decision which has interpreted that statutory section are not controlling in this case. *See* Rule 501 of the Federal Rules of Evidence. The company says that Rule 501 and the case law thereunder makes clear that State law privileges and prohibitions on disclosure, both statutory and non-statutory, are not controlling in non-diversity actions in federal court; *Kaufman v. Edelstein,* 539 F.2d 811, 820 n. 13 (2d Cir.1976), and that State law privileges and prohibitions do not control State law claims that are pendent to federal claims in non-diversity cases. *See, e.g., William T. Thompson Co. v. General Nutrition Corp.,* 671 F.2d 100, 101 (3d Cir.1982).

Nevertheless, OCC acknowledges that this court may apply the prohibition on disclosure relied on by the State if it finds prohibition to be consistent "with principles of common law ... as interpreted by the [federal] courts ... in light of reason or experience." Rule 501 of the Federal Rules of Evidence. According to OCC, in balancing the State's interest in non-disclosure against the federal interest favoring disclosure, this court should find that the federal principle in furtherance of this court's fact-finding function prevails here. *See e.g., Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980). Again, OCC notes that, without the requested health data, it would be unable to adequately defend against several of the allegations contained in plaintiffs' complaint. Therefore, OCC argues that the public interest in fair enforcement of federal environmental law is too strong to permit the exclusion of highly relevant evidence through application of the non-disclosure provision. OCC argues that the case of *EEOC v. St. Francis Community Hospital,* 70 F.R.D. 592 (D.S.C.1976) is particularly illustrative on this point. *See also Carr v. Monroe Manufacturing Co.,* 431 F.2d 384, 388–90 (5th Cir.1970), *cert. denied,* 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 451 (1971).

Similarly, OCC also argues that principles of collateral estoppel are not applicable here. According to the company, the state court appellate handling of the health data issue in the context of the Love Canal personal injury and property damage actions did not involve the State as a party. OCC points out that in that decision, the medical records and health questionnaires were sought only because of their relevance to the personal injury claims asserted by each plaintiff and that, to the extent the court decided the applicability of section 206(1)(j), the decision was limited to the questionnaires only. Secondly, it argues that even with respect to these questionnaires, the court's ruling did not decide whether the materials were admissible or discoverable in a federal court action.

OCC also claims that any privilege conferred by section 206(1)(j) has been waived by the State after the health of the residents were put directly at issue. *McClusky v. United States,* 562 F.Supp. 515, 516 (S.D.N.Y.1983); *Haymes v. Smith,* 73 F.R.D. 572, 577 (W.D.N.Y.1976); *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash.1975).

Finally, OCC argues that much of the health data sought by OCC does not come within the ambit of section 206(1)(j). The company argues that much of the requested information cannot be properly deemed "scientific studies and research" within the meaning of section 206(1), (3), or "reports on forms prepared by [the Commissioner]" pursuant to section 206(1)(j). In addition, the company argues that section 206(1)(j) is facially inapplicable to OCC's interrogatories.

In response to these arguments, the State argues, first, that OCC is collaterally estopped from litigating this motion because a prior state court decision found the identical data privileged from release. *In re Love Canal Actions, supra.* See Kaminsky, *State Evidentiary Privileges in Federal Civil Litigation,* 43 Ford.L.Rev. 923, 937–62 (1974–75).

The State says that where, as here, the seriousness of a State policy of confidentiality is underscored by a State appellate decision barring the release of the same data, principles of collateral estoppel require that a defendant's motion be denied. *Notey v. Hynes,* 418 F.Supp. 1320, 1325 (E.D.N.Y.1976).

Second, the State contends that the privilege established by section 206(1)(j), as applied to the health data by the State Supreme Court, ought not to be defeated by this court on the basis of Rule 501 of the Federal Rules of Evidence. According to the State, where, as here, there is no conflict between a State privilege and federal law, federal courts should recognize and apply State policy in order to prevent forum shopping and the inequitable administration of the law. *Cf., 118 East 60th Owners, Inc., v. Bonner Properties, Inc.,* 677 F.2d 200, 205 (2d Cir.1982). *See also, Lora v. Board of Education of New York,* 74 F.R.D. 565 (E.D.N.Y.1977); *United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976).

The State argues that in this case, the individual and State claims in support of a need for confidentiality outweighs the competing interests of the defendants.[9] The State says that the information it collected is essential to its common-law and statutory duties to protect the health of its citizens and could not have been obtained without an absolute guarantee of confidentiality. *In re Love Canal Actions, supra,* 460 N.Y.S.2d at 855; *see also* Item 186, Exh. A (Justification for Amendment of ¶ 206, Subdivision 1, Public Health Law, by adding subparagraph (j), January 22, 1957).

The State claims that section 206(1)(j) was enacted to achieve the voluntary cooperation of both physicians and patients with the DOH's medical and scientific research effort. In order to achieve this end, the statute provided assurance of confidentiality to both of these groups and, notwithstanding any other evidentiary rules, was not to be used as evidence in any legal or administrative action (Item 186, Exh. B).

The State contends that this privilege is so clearly important to the State's goals that the Fourth Department has said that the information is "not subject to disclosure no matter how strong the showing of need or relevancy;" that "[t]he prohibition against disclosure is absolute." *In re Love Canal Actions,* 460 N.Y.S.2d at 854 (citations omitted).

The State argues that the failure of this court to recognize this privilege for confidential health data would result in long-term damage to its ability to conduct scientific medical studies. The State believes that it has no means to compel or entice persons to supply this information absent a voluntary compliance with its request. *Cf., United States v. King, supra.* Indeed, it urges that the present compliance is based on the trust of patients and physicians in its promise that it will provide absolute confidentiality regarding the sources of its information. Without its ability to make these assurances, the State says it would be unable to obtain the information necessary to conduct scientifically valid studies

---

**9.** *See Robinson v. Magovern,* 83 F.R.D. 79 n. 3 (S.D.N.Y.1979), which lists the following factors to be considered by a court in determining whether privilege expectations are protected in a given case:

first, the federal government's need for the information being sought in enforcing its substantive and procedural policies; second, the importance of the relationship or policy sought to be furthered by the state rule of privilege and the probability that the privilege will advance that relationship or policy; third, in the particular case, the special need for the information sought to be protected; and fourth, in the particular case, the adverse impact on the local policy that would result from non-recognition of the privilege.

and to protect and promote the health of its residents.

Further, contrary to OCC's assertions, the State contends that it did not waive its privilege under section 206(1)(j) by alleging harm to its citizens. *Cf., Chase Manhattan Bank v. Drysdale Securities Corp.,* 587 F.Supp. 57, 58 (S.D.N.Y.1984). The State argues that section 206(1)(j) is not an optional privilege but, instead, one which cannot be used in litigation and "unequivocably prohibited" a waiver by either the State or any individual. *In re Love Canal Actions,* 460 N.Y.S.2d at 854–55. The State also notes that all of the information requested by defendants was obtained to carry out the objectives of section 206(1)(j). *See* Axelrod Affidavit, ¶¶ 8–10.

In light of all of the above, the State claims that the release of unredacted health information would be a violation of the constitutional right of privacy of the Love Canal residents. Item 186, Exh. A. *Cf., Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977); *Department of the Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).

### Protective Order

Finally, in light of the important and legitimate interests of the Love Canal residents and the State in this case, OCC argues that the disclosure of the health data will be adequately protected by a carefully drawn protective order. *See, e.g.,* Item 180, Exh. H. *See also, EEOC v. St. Francis Community Hospital,* 70 F.R.D. at 595; *Carr v. Monroe Manufacturing Co., supra.* The company argues that any proposed redaction of the documents involved is unworkable and would result in the production of virtually meaningless data. *See* Item 189, Supplemental Affidavit of Steven K. Yablonski.

The State disagrees. It contends that OCC's proposed protective order does not properly balance the federal interest in full discovery against the strong State and individual interests in maintaining the privacy of health data. As an alternative to a violation of these latter interests, the State urges that, in the event this court decides to grant defendant's motion, it require that this information be released without accompanying identifying data, or in a coded form. *Cf., Lora v. Board of Education, supra* at 574. It argues that the identifying data can be quite easily redacted, is not required for the effective use of that data, and that defendants' proposed protective order does not limit the company's invasion of privacy to the full extent possible. *See, e.g.,* Item 192, Affidavit of Seth M. Abrams.

### Discussion

In light of all of the above arguments, this court finds as follows. First, this court believes that the health data sought by OCC in this case is relevant to this case within the meaning of Rule 26(b)(1) of the Federal Rules of Civil Procedure. As is argued in the company's motion papers, the State's health-related allegations are central to its present multimillion dollar damage claims which arose out of various remedial and relocation programs implemented in the wake of the 1978 declared health emergency. It is undisputable that the health data at issue in the present motion helped form the basis for some of these expenditures and is, therefore, sufficiently relevant to the damage issue to warrant discovery on this ground.

In addition, this court also believes that OCC has clearly shown that no alternative source of this information is realistically available to it. The possibility, suggested by the State, that OCC now obtain written consents from the Love Canal residents is not feasible. I also believe that there is a serious question whether the residents still have all of the health data information the State possesses, even if they would consent to OCC's discovery of such.

■ Indeed, the only truly serious obstacle to OCC's present motion is the State privilege of confidentiality contained within section 206(1)(j) of the New York Public Health Law. As was discussed in the Fourth Department's decision, *In re Love Canal Actions, supra,* a privilege of priva-

cy attaches to the documents in the possession of the Department of Health pursuant to section 206(1)(j), which makes those documents confidential and not subject to discovery. The Fourth Department found, further, that the individual litigants had not waived this confidentiality by bringing their respective actions.

In coming to this decision, the Fourth Department agreed with Special Term, 112 Misc.2d 861, 449 N.Y.S.2d 134 (1982), that the Legislature had created the section 206(1)(j) privilege of privacy for State-conducted health emergency studies with two major policies in mind: 1) to protect the privacy of the State's citizens, and 2) to create an atmosphere of trust to enable the DOH to gather and compile the health data it needs to carry out its statutory purpose. *In re Love Canal Actions,* 460 N.Y.S.2d at 854. In light of this unambiguous legislative intent, the State appellate court found that the disputed health information was "confidential and not subject to disclosure no matter how strong the showing of need or relevancy." *Id.* (citation omitted).

■ I believe that the state court's decision is not entitled to collateral estoppel effect now. The issue before this court in the instant case is a different one than that decided in the state court. First, as OCC has pointed out in its papers, the State was not a party to the state court case and, of course, is a party here. The State—not the individual residents of the Love Canal—have brought the present action to recover damages arising from certain relocation and remedial measures that were taken, in part, because the State's interpretation of the health data now in dispute.

■ As was discussed in the state court decisions, the privilege granted by section 206(1)(j) belongs in large part to the State. This statutory section was intended by the New York Legislature to allow the DOH to freely conduct studies and research aimed at improving public health and upgrading the quality of medical care within the State. *See generally,* N.Y.Legis.Ann., 1963, p. 276. It was obviously felt that a guarantee of confidentiality would encour-

age the voluntary participation of the public in such studies. *In re Love Canal Action, supra,* 460 N.Y.S.2d at 853–54. Because this case, unlike the state court decisions regarding section 206(1)(j), involves the assertion of the privilege by the government entity to whom the privilege belongs, I believe principles of collateral estoppel should not control here. *Id.* 460 N.Y.S.2d at 855.

■ I believe that the crucial question to be resolved involves the status of the state court privilege within the context of the present federal lawsuit. *See* Rule 501 of the Federal Rules of Evidence. In my opinion, Rule 501 mandates that the State law privilege contained in section 206(1)(j) be balanced against the federal interest in disclosure in this case.

Given the present posture of this litigation, however, this court will refrain from ruling on this question at the present time. As was noted in the State's moving papers (Item 186, pp. 25–26; Item 193, pp. 1–5), there are presently two outstanding summary judgment motions—under CERCLA and the common law of public nuisance—pending before this court. These motions are scheduled for argument in September and October of 1986. Because I believe that evidence of the health of Love Canal residents is essentially immaterial to these motions, this court will defer ruling on the instant health data motion until such time as the summary judgment motions are decided. At that time, a decision on the health data motion can be expeditiously issued, if this is still deemed to be appropriate.

As was made clear from all of the briefing on the health data question, the instant motion concerns very sensitive, important, and sometimes competing considerations: the privacy of former Love Canal residents, the ability of the DOH to be afforded section 206(1)(j) protection, as well as the right of OCC to defend itself properly in this complex litigation. Because any decision on the instant matter would necessarily involve deciding what effect an important

state law privilege has in the federal context, I believe such a decision should not be made unnecessarily or prematurely. Therefore, this court will defer ruling on the present motion pending resolution of plaintiffs' upcoming motions for summary judgment.

So ordered.